**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Valerie Yeager, as personal representative of the Estate of Christopher Yeager, et al., | No. CV-22-00574-PHX-DWL (ESW) |
| Plaintiffs, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

On February 24, 2020, Christopher Yeager ("Yeager") was an inmate in the custody of the Arizona Department of Corrections Rehabilitation and Reentry ("ADCRR") and was housed at the Arizona State Prison Complex-Florence ("ASPC-Florence"), Central Unit in a single-occupancy cell.

Under ADCRR policy, the inmates in Yeager's cell block—which ADCRR considered a "close security" unit because the inmates represented "a high risk to the public and staff"—were supposed to be locked down in their cells except under limited circumstances. Nevertheless, on the morning of February 24, 2020, various cell doors in Yeager's cell block were left open and inmates were able to move throughout the cell block in an unrestricted manner. At approximately 9:00 a.m., Yeager was violently assaulted inside his cell by another inmate.

ADCRR policy also required corrections officers to follow various protocols for conducting security checks throughout the day. Nevertheless, Yeager remained in his cell

for more than seven hours before corrections officers claim to have first noticed his injuries. Yeager died after he was taken to the hospital and there is evidence that Yeager likely would have survived had he received more prompt medical assistance.

In this action, Yeager's sister (as the personal representative of his estate) and Yeager's parents (together, "Plaintiffs") have asserted claims under 42 U.S.C. § 1983 against five of the corrections officers who were working in Yeager's cell block on the day of the assault, under the theory that they were deliberately indifferent to Yeager's safety and well-being in violation of the Eighth Amendment. (Doc. 1-3 ¶¶ 54-65.) Plaintiffs have also asserted a state-law wrongful death claim against the State of Arizona ("the State"). (*Id.* ¶¶ 66-74.)

Now pending before the Court are Defendants' motions for summary judgment. (Docs. 249, 258, 252/282, 260, 269, 285.) Plaintiffs oppose the motions. (Doc. 306.)[1] For the reasons that follow, the motions are granted in part and denied in part.

**STATEMENT OF FACTS**

The background facts below are taken from the parties' summary judgment submissions and other materials in the record and are uncontroverted unless noted.

I.    <u>Yeager, His Cellblock, And The Relevant Prison Policies</u>

On February 9, 2016, Yeager began serving an eight-year sentence at ASPC-Florence for auto vehicle theft. (Doc. 309 ¶ 1.)

On February 24, 2020, there were 991 inmates assigned to ASPC-Florence. (Doc. 307 ¶ 1.) Yeager was assigned to Cell 3G-01 in Cellblock No. 3 ("CB3"), where he had been housed since July 31, 2018. (Doc. 309 ¶¶ 3-4; Doc. 307 ¶¶ 26-27.) All of the cells in Central Unit were single cells. (Doc. 309 ¶ 5.) Yeager's cell was at the end of the upper level of the row of cells on the west side of CB3, known as the run, and was located the farthest away from the key panel on its run. (Doc. 309 ¶ 6; Doc. 312 ¶ 56.) The location

---

[1]    The only party who requested oral argument is Officer Bromund. That request is denied because the matter is fully briefed and oral argument will not aid the Court's decision. *See* LRCiv 7.2(f).

of Yeager's cell made it difficult or even impossible for an officer standing in the key panel area to accurately determine by sight whether it was open or closed. (Doc. 312 ¶ 57.)

CB3 housed 134 "close custody" inmates in eight different runs labeled "A" through "I." (Doc. 307 ¶ 4.) Inmates receive a "close custody" security designation based on various factors, including the severity of the crimes for which they are incarcerated. (Doc. 302 ¶ 15.) In February 2020, the inmates in CB3 included several convicted murderers and violent offenders. (*Id.* ¶ 16.) ADCRR policy describes "close custody" inmates as those "who represent a high risk to the public and staff." (*Id.* ¶ 17.)

ADCRR policy required inmates in CB3 to "move in controlled movement," which means they had to have a specific, pre-approved reason to be let out of their cells (*e.g.*, for meals, recreation time, work assignments); otherwise, CB3 inmates "had to be locked down in their cell." (*Id.* ¶ 21.) Inmate movements in CB3 were controlled by the key officer, whose job was to open and close the cell doors according to the instructions on the turnout sheet ("TOS") for that day, and were monitored by the control room officer and floor officers. (*Id.* ¶¶ 23-24.)

Under ADCRR policy, when "close custody" inmates were traveling to chow or recreation, they were supposed to engage in "mass movement" whereby the key officer would open their cell doors and allow them to exit their cells and they would then "stage" together inside the building until the turnout was complete. (Doc. 259 ¶ 9; Doc. 310 ¶ 9 [not disputing this description of the policy but asserting that "the unit did not operate in accordance with policy with respect to inmate movement"].) Pursuant to the policy, inmates were supposed to turn out to chow three times a day and turn out to recreation multiple times per week. (Doc. 259 ¶¶ 11-12; Doc. 310 ¶¶ 11-12.)

ADCRR is required to allow "close custody" inmates at least 20 hours of out-of-cell time per week. (Doc. 309 ¶ 8.) CB3 was known as a "worker's building," meaning that inmates in CB3 frequently had work assignments that required them to be out of their cells. (*Id.* ¶ 14.) Inmates were not required to be handcuffed to walk to and from daily activities. (*Id.* ¶ 15.)

Under ADCRR policy, security checks were supposed to be conducted "as close to every 30 minutes as possible" and at least every hour. (Doc. 302 ¶ 30, 170. *See also* Doc. 283 ¶ 32 [sealed].) For each security check, the floor officer was required to physically observe "living breathing flesh" of the inmate being checked on. (Doc. 302 ¶ 31. *See also* Doc. 283 ¶ 31 [sealed].) If the floor officer could not see the inmate because it was too dark, the floor officer was expected to use a flashlight or turn on the lights to confirm living, breathing flesh. (Doc. 302 ¶ 34.) Additionally, ADCRR policy required a "formal count," in which the counting officer was required to verify that the inmate's face matched his prison-issued identification card and to confirm living, breathing flesh for each inmate. (Doc. 302 ¶¶ 35-36. *See also* Doc. 283 ¶ 33 [sealed].) ADCRR policy required floor officers to report each completed formal inmate count to the control room officer so it could be recorded in the correctional services journal maintained by the control room officer. (Doc. 302 ¶ 37.)

If an officer could not verify living, breathing flesh during a security check or otherwise had reason to believe an inmate was injured or needed help, ADCRR policy required the officer to initiate the Incident Command System ("ICS") to get help from additional officers. (Doc. 302 ¶ 38.) The ICS establishes protocol for responding to emergencies within the prison. (*Id.* ¶ 39.) Officers are required to activate ICS within three minutes of assessing an emergency situation. (*Id.* ¶ 40.) Because the cells in CB3 did not have emergency call buttons, the security checks conducted by the floor officers were the only way for prison staff to learn of an emergency circumstance that was not otherwise immediately obvious. (*Id.* ¶ 41.)

Before February 24, 2020, Yeager had no documented history of fights or assaults with other inmates while incarcerated at ASPC-Florence. (Doc. 309 ¶ 16.)

II.    The Individual Defendants' Background And Responsibilities

Following graduation from the Correctional Officer Training Academy, Defendants Andrew Bromund ("Officer Bromund") and Brent Hurst ("Officer Hurst") were assigned to work at ASPC-Florence Central. (Doc. 309 ¶ 19; Doc. 310 ¶¶ 19, 21, 24.) During the

1    first three to four weeks of their assignments, Officers Bromund and Hurst were required
2    to participate in the ADCRR's on-the-job training ("OJT") (Doc. 309 ¶ 20.)

3        On February 24, 2020, Defendant Jose Mendoza ("CO II Mendoza"), who also
4    served as a floor officer at CB3, was serving as the Field Training Officer ("FTO") for
5    Officers Bromund and Hurst. (Doc. 309 ¶ 21; Doc. 307 ¶¶ 15, 21.) CO II Mendoza started
6    working as an officer for the ADCRR in 2012. (Doc. 302 ¶ 48.) It is the FTO's
7    responsibility to give officer trainees practical experience in performing their duties. (Doc.
8    307 ¶ 22.) CO II Mendoza was previously assigned to CB4 and had been assigned to CB3
9    for less than a week on February 24, 2020. (Doc. 307 ¶¶ 18-19.) As a result, CO II
10   Mendoza was still learning which inmate lived in each cell. (*Id.* ¶ 20.)

11       As an OJT officer, Officer Bromund shadowed CO II Mendoza and participated in
12   training-related activities at CO II Mendoza's instruction. (Doc. 309 ¶ 22.) These activities
13   included: (1) performing security walks when instructed to do so by CO II Mendoza; (2)
14   escorting inmates to "chow"; (3) pulling inmates from their cells for urinalysis testing; (4)
15   strip searching inmates as they returned from certain job assignments; (5) searching
16   inmates as they returned from "rec"; (6) escorting inmates to medical appointments; and
17   (7) reviewing training modules on ADCRR's computer system. (*Id.* ¶ 23.)

18       On February 24, 2020, Officer Bromund was working as an OJT officer for CB3.
19   (*Id.* ¶ 24.) Because he was new to the building, Officer Bromund was still in the process
20   of learning which inmate was assigned to each cell. (*Id.* ¶ 26.)

21       On February 24, 2020, Defendant Dylan Elvey ("Officer Elvey") was working as
22   the key officer for CB3; in this capacity, it was his job to open the building and cell doors
23   for inmates and to assist floor officers. (Doc. 307 ¶ 16; Doc. 312 ¶ 30.) Officer Elvey had
24   worked that post for two or three years, usually on the morning shift. (Doc. 302 ¶ 55.)
25   CB3 had 16 key panels, one for the front half and one for the back half for each of two
26   sides (left or right) of each of its four floors. (Doc. 312 ¶ 31.) Officer Elvey, as key officer,
27   was tasked with operating all 16 panels during his shift. (*Id.* ¶ 32.) Officer Elvey was
28   required to move up and down floors and between key panels for each side nearly

constantly throughout the day.  (*Id.* ¶ 33.)  The key panel had a selector pin for each door under its control.  (*Id.* ¶ 34.)  Selector pins could be moved up or down.  (*Id.* ¶ 35.)  When a pin was in the up position, its corresponding door was selected for movement, to be either opened or closed.  (*Id.* ¶ 36.)  When a pin was in the down position, its corresponding door would not be selected for movement and thus its door would be considered inactive.  (*Id.* ¶ 37.)  Selecting a door with its selector pin did not move the door on its own, but enabled it to be moved by the action of a separate lever.  (*Id.* ¶ 38.)  The lever could be moved left or right to open or close those doors that were currently selected with their selector pins in the up position.  (*Id.* ¶ 39.)  If a door was open but needed to remain open while a second door's opening or closing operation was being performed, that first door's selector pin would have to be moved to the down position to allow the second operation to be performed without affecting the first door's position.  (*Id.* ¶ 40.)

At times, a malfunction would occur in which a door with its selector pin in the down position would move open or closed despite not being selected.  (*Id.* ¶ 41.)  The key panel did not have lights or other means of displaying which doors were open or closed at any given time.  (*Id.* ¶ 42.)  The only visible indication of whether a door was open or closed was either direct observation of the door or observing whether its pin on the key panel was up or down, although the latter was not always correct.  (*Id.* ¶ 43.)

The viewing angle from the control panel area did not allow a complete or clear view of the position of every door on its corresponding run, especially for those doors farther away from the key panel area.  (*Id.* ¶ 44.)  Officer Elvey's duties required him to move constantly from one key panel to the next, often on different floors.  (*Id.* ¶ 45.)  Moving from one key panel to the next would require Officer Elvey to lose sight of the run in front of Yeager's cell.  (*Id.* ¶ 46.)  Officer Elvey was not the only corrections officer with the ability to control the doors.  (*Id.* ¶ 47.)  Other officers could get the keys to the tunnel where the control panels were located and then manipulate the doors.  (*Id.* ¶ 48.)  It was common practice for corrections officers other than the key officer to manipulate the doors throughout the day and for the key officer to assist other officers in their duties as

well.  (*Id.* ¶ 49.)

A single day shift in CB3 typically required between 600 and 900 opening and closing operations of cell doors.  (*Id.* ¶ 50.)  The key officer was required to open and close doors based on the schedule provided in the TOS for that day and to also open or close doors for non-scheduled reasons as eventualities came up throughout the day.  (*Id.* ¶ 51.)  Inmates may need to be "turned out" of their cells for reasons not prescheduled on the master pass TOS, such as for medical, library, or chaplain visits.  (*Id.* ¶ 52.)  There were typically 60 to 100 changes to the TOS during a day shift.  (*Id.* ¶ 53.).  According to POST Orders, cell doors opened for a turnout were to be closed after the turnout was complete.  (*Id.* ¶ 54.)

On February 24, 2020, Defendant Steven Marshall ("CO II Marshall") was working as the control room officer for CB3.  (Doc. 307 ¶ 17.)  Pursuant to ADCRR policy, the control room officer was required to remain at his post in the control room during the entire shift, so he could continually observe activity occurring in the Housing Area through the surveillance monitors.  (Doc. 302 ¶ 25.)  The control room officer was responsible for making entries in the Correctional Service Journal, to include documenting the security walks completed by floor officers.  (*Id.* ¶ 26.)  Officers were supposed to verbally notify the officer in charge of making journal entries when they conducted a security walk or formal count, either in person or on the radio.  (Doc. 310 ¶ 90.)  ADCRR policy permitted a floor officer to exchange positions with the control room officer only if the exchange had been approved by the shift commander.  (Doc. 302 ¶ 27.)  CO II Marshall started working at the correctional facility around the second week of January 2020, and February 24, 2020 was his first or second day working in CB3.  (Doc. 314 ¶¶ 26, 31.)  CO II Mendoza was CO II Marshall's FTO.  (*Id.* ¶ 27.)

III.    The Events Of February 24, 2020

In practice, every day before housing unit officers began their shifts, they were supposed to be informed of information from the Daily Briefing Sheet.  (Doc. 302 ¶ 62.)[2]

---

[2]    Defendants object to the admissibility of the Daily Briefing Sheet on several

On February 24, 2020, the Daily Briefing Sheet for CB3 expressly warned officers that there were "[l]ots of assaults lately" and to "be mindful of situational awareness," "[w]atch for inmates acting funny," and "DO NOT BECOME COMPLACENT." (*Id.* ¶ 63.) It also instructed that "[a]ll gates and doors will be secured at all times. This includes cell doors." (Doc. 302-1 at 266.)  On that day, all of the CB3 officers had radios they could use to communicate with each other while in different areas of the prison.  (Doc. 302 ¶ 28.) Unlike the control room officers, ADCRR policy required floor officers to remain in constant motion in the housing unit so they could observe, supervise, and report inmate behavior and provide an immediate response to emergency situations.  (*Id.* ¶ 29.)

At 6:33 a.m. on February 24, 2020, CO II Mendoza completed a security check in

---

grounds.  First, some Defendants argue that the statements in the Daily Briefing Sheet are hearsay.  (*See, e.g.,* Doc. 331 at 6.)  But statements regarding the dangerous conditions in the prison on the day of the incident are admissible for the non-hearsay purposes of providing notice to Defendants and establishing Defendants' knowledge and mindset.  *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1113 (N.D. Cal. 2008) ("When a [document] is offered to prove what the [document] asserts . . . this is classic inadmissible hearsay.  When, however, a [document] is offered to prove the effect of the report on the listener, i.e. to show *notice* to the recipient, this does not fall within the definition of hearsay and is admissible evidence.").  Second, some Defendants argue that "the statement, itself, has never been authenticated." (*See, e.g.,* Doc. 331 at 6-7.)  However, Defendants do not elaborate on this argument and do not explain the origin of this document, including and whether they, themselves, disclosed it.  *Carolina v. JPMorgan Chase Bank NA*, 2021 WL 5396066, *6 (D. Ariz. 2021) ("[B]ecause Plaintiff does not develop her authenticity challenge in any depth, the Court deems it forfeited.").  *Cf. Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (district court erred by sustaining "unexplained generalized objections" to summary judgment evidence).  At any rate, a document may be self-authenticating where "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," support that the item is what the proponent claims it is.  Fed. R. Evid. 901(b)(4).  Here, the Daily Briefing Sheet is labeled as an "Arizona Department of Corrections – Security Staffing" form, it is entitled "Daily Briefing Sheet" for the Florence Complex-Central Unit, it includes the date and shift it purports to cover, and it is signed by the Shift Commander, Chief of Security, and Deputy Warden.  (Doc. 302-1 at 266.)  Third, some Defendants argue that because they testified they did not see the Daily Briefing Sheet on the day of the incident, there is "no evidence" that they saw it.  (*See, e.g.*, Doc. 328 at 8.)  But this argument goes to the weight of the evidence, not admissibility.

CB3. (Doc. 307 ¶ 34.) At around 7:44 a.m., Yeager's cell door was opened "for absolutely no reason" consistent with a penological interest. (Doc. 302 ¶ 64.) Almost immediately after the cell was opened, two inmates entered Yeager's cell. (*Id.* ¶ 65.) Approximately five minutes later, one of the inmates exited Yeager's cell. (*Id.* ¶ 66.) A few minutes after that, the cell door closed with the other inmate still inside. (*Id.*) About three minutes later, at or about 7:56 a.m., the cell door was reopened and the other inmate stepped out of the cell with Yeager. (*Id.* ¶ 67.) By 8:49 a.m., Yeager had returned to his cell. (*Id.* ¶ 68.)

At approximately 8:58 a.m., inmates Jon Simmons ("Inmate Simmons") and Robert Leighton ("Inmate Leighton") arrived at Yeager's cell. (Doc. 310 ¶ 47.) Yeager spoke with them, reentered his cell, and began clearing items from the floor and area. (*Id.*)

At approximately 8:59 a.m., Inmate Simmons stepped into Yeager's cell and Inmate Leighton stood covering the door. (Doc. 309 ¶ 31; Doc. 310 ¶ 48.) Yeager was assaulted at 9:00 a.m. or shortly thereafter. (Doc. 310 ¶ 50.) At 9:00 a.m., Inmate Simmons stepped out of the cell and left the pod. (*Id.* ¶ 49.)

Between 9:00 a.m. and 9:07 a.m., inmates cleaned Yeager's cell. (Doc. 310 ¶ 52.)

At 9:06 a.m., Officer Hurst and CO II Mendoza entered the run for a security check and entered the lowest tier of the unit. (Doc. 307 ¶ 39.) Yeager's cell was on the upper tier. (*Id.*) CO II Mendoza did not go upstairs to Yeager's cell, but at 9:07 a.m., Officer Hurst went to the upper tier. (*Id.* ¶ 40.) Officer Hurst then went upstairs alone and walked down the second-floor run, toward Yeager's cell. (Doc. 302 ¶ 72.) Yeager's cell was still open at this time. (*Id.* ¶ 73.) As Officer Hurst approached Yeager's cell, another inmate stepped out of it. (*Id.* ¶ 74.) Officer Hurst walked past the inmate and glanced into Yeager's open cell. (Doc. 302 ¶ 75; Doc. 283   ¶ 55; Doc. 310 ¶ 55.)[3] Officer Hurst then turned around to address the inmate who had been in Yeager's cell but did not send him back to his cell or confirm where he was supposed to be. (Doc. 302 ¶ 76.)

---

[3]     Officer Hurst has made inconsistent claims that (1) he verified Yeager's "living breathing flesh" when he glanced in Yeager's cell at 9:07 a.m. and (2) he did not confirm Yeager's "living breathing flesh" during his security walk. (Doc. 302 ¶¶ 78-79.)

Between 9:10 a.m. and 9:13 a.m., after Officer Hurst left the run, inmates returned to Yeager's cell to resume cleaning; they brought trash bags and towels into the cell as if to clean up a mess. (Doc. 302 ¶ 81; Doc. 309 ¶¶ 32, 41; Doc. 310 ¶ 57.)

At or around 9:30 a.m., Yeager's cell block neighbor, Kenneth Severns ("Inmate Severns"), reportedly arrived back at his cell. (Doc. 302 ¶ 82.)[4] When Inmate Severns arrived at his cell, he observed that Yeager was lying on the floor, unresponsive in a pool of his own blood, with obvious injuries. (*Id.* ¶ 83.)

At or around 10:28 a.m., Yeager's cell door finally closed. (*Id.* ¶ 84.)

At 11:00 a.m., CO II Mendoza asked CO II Marshall, who was the assigned control room officer, to complete the formal count (even though CO II Mendoza did not have the authority to make such a request, which needed to be approved by the shift commander pursuant to ADCRR policy).[5] (Doc. 283 ¶ 42; Doc. 307 ¶ 42.)

At 11:20 a.m., CO II Marshall walked the length of the second-floor run and stopped in front of Yeager's cell. (Doc. 302 ¶ 89; Doc. 307 ¶ 43.) CO II Marshall stood in front of Yeager's cell and stared into it for approximately three minutes. (Doc. 302 ¶ 90.) At one point, CO II Marshall removed his radio from its holster in preparation to make a radio call, but he then returned the radio to its case and walked away. (*Id.* ¶ 91.) CO II Marshall made later statements[6] that (1) he stood there for so long because he could not see Yeager's identification card and (2) "the whole point with the, pulling my radio out was cause he wasn't answering." (*Id.* ¶¶ 93-94.) CO II Marshall claimed that he saw Yeager laying on his back on his bed and that he could see Yeager's face clearly to identify him and confirm

---

[4] Some Defendants object to Inmate Severns's statements as inadmissible hearsay because they are taken from an interview conducted during an investigation after the incident (*see, e.g.*, Doc. 331 at 10-11), but these statements could be presented in an admissible form at trial. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).

[5] CO II Marshall asserts that he was unaware of this policy. (Doc. 285 ¶ 47.)

[6] Some Defendants object, on hearsay grounds, to audio recordings of their interviews recorded during the prison's investigation. This objection is unavailing because the recordings reflect statements of a party opponent. *See* Fed. R. Evid. 801(d)(2).

his living, breathing flesh.  (*Id.* ¶ 96.)

At 12:52 p.m., Officer Hurst walked the length of the upstairs run of CB3.  (Doc. 307 ¶¶ 45-46.)   During this security check, Officer Hurst again quicky glanced into Yeager's cell. (Doc. 302 ¶ 104.)  Officer Hurst stated that he confirmed Yeager's "living breathing flesh" during this security walk.  (*Id.* ¶ 105.)  However, Officer Hurst later told a prison investigator that he failed to properly conduct security checks on February 24, 2020. (*Id.* ¶ 106.)

At 12:53 p.m., Yeager's cell door was opened again for "chow" but Yeager did not exit his cell.  (*Id.* ¶ 107.)  From approximately 12:53 p.m. to 1:25 p.m., Yeager's cell door was inexplicably opened again.  (*Id.* ¶ 108.)  During that time, Yeager did not exit his cell, but several inmates entered and exited his cell and his door remained opened.  (*Id.* ¶ 109.)

At or around 2:25 p.m., CO II Mendoza instructed Officer Bromund to follow him while he conducted a security check of CB3. (Doc. 309 ¶ 39.)  At or around 2:42 p.m., Officer Bromund looked into Yeager's cell.  (*Id.* ¶ 40.)  Officer Bromund initially stated that Yeager was lying down "with his back to [Officer Bromund]" but later stated that he was able to confirm Yeager's living, breathing flesh because he saw Yeager's chest movement. (Doc. 302 ¶¶ 115-116.)  CO II Mendoza did not attempt to look into Yeager's cell, but rather stopped walking right before reaching Yeager's cell. (Doc. 302 ¶ 111.)  The video reflects that after looking into Yeager's cell, Officer Bromund spoke to CO II Mendoza and gestured over his shoulder toward Yeager's cell.  (*Id.* ¶ 117.)

At or around 3:17 p.m., Officers Bromund and Hurst were instructed to conduct another security check of CB3. (Doc. 309 ¶ 46.)  Officer Bromund started the check at or around 3:17 p.m. but did not proceed all the way down the run to Yeager's cell.  (Doc. 307 ¶ 51.) CO II Mendoza was watching Officer Bromund complete this walk from the control room.  (Doc. 302 ¶ 119.)  Officer Bromund later told investigators that he did not recall that he only completed half the walk and later testified that he believed CO II Mendoza "or another officer" called him away for a training exercise, which prevented him from completing security checks for the last five cells on the run. (Doc. 302 ¶¶ 122-25.)  Officer

1   Bromund stated that he was told by his supervisor that the walk would be completed and

2   entered into the log. (*Id.* ¶ 126.) However, CO II Mendoza, Officer Bromund's supervisor,

3   testified that he did not call Officer Bromund away for a training assignment and did not

4   know that Officer Bromund failed to complete the security walk. (*Id.* ¶¶ 127-28.)

5          Shortly after 4:00 p.m., CO II Mendoza instructed Officers Bromund and Hurst to

6   conduct formal counts and a security check of CB3. (Doc. 309 ¶ 53.)

7          At 4:16 p.m., while conducting formal counts, Officer Bromund looked into

8   Yeager's cell and saw Yeager lying face-first on the floor. (*Id.* ¶ 54.) When Yeager was

9   found, he was unresponsive, there was blood on his head and face and on the ground, and

10  there was vomit all over the bunk. (Doc. 302 ¶ 97; Doc. 309 ¶ 32.)

11         At or about 4:17 p.m., Officer Hurst activated an ICS. (Doc. 309 ¶ 55.) Yeager was

12  transported to Chandler Regional Medical Center and was in a vegetative state until he died

13  on March 14, 2020. (Doc. 302 ¶¶ 135-36; Doc. 309 ¶ 56.)

14  IV.    The Investigation

15         After the assault, the Deputy Warden of the Central Unit, Jason Monson ("Deputy

16  Warden Monson"), instructed Lieutenant Kolton Wood ("Lieutenant Wood") to review

17  footage of the unit on the day of the assault. (Doc. 302 ¶¶ 145-46.) Lieutenant Wood

18  documented multiple deviations from ADCRR policy and Deputy Warden Monson

19  identified the need for the investigation to go "in a different direction than the original

20  information suggesting an inmate overdose" because he "suspect[ed] foul play." (*Id.*

21  ¶¶ 147-51.) Deputy Warden Monson requested that an investigator in the Department's

22  Criminal Investigations Unit conduct an investigation. (*Id.* ¶¶ 150.) At the conclusion of

23  the investigation, Deputy Warden Monson recommended that CO II Mendoza, CO II

24  Marshall, and Officer Elvey be fired and that Officers Hurst and Bromund be suspended.

25  (*Id.* ¶¶ 153-58.)[7] CO II Mendoza, Officer Bromund, and CO II Marshall then voluntarily

26

27  [7]    Some Defendants assert that these recommendations are inadmissible because they
    constitute subsequent remedial measures under Rule 407. (*See, e.g.,* Doc. 329 at 2.) As an

28  initial matter, it is not clear that any individual Defendant could invoke Rule 407 in this
    context or that unheeded recommendations could ever qualify as subsequent remedial

resigned. (*Id.* ¶¶ 159-161.)

ADCRR then initiated two further tracks of investigation, one by the Administrative Investigations Unit conducted by Justin Varvel ("Varvel") and one by the Criminal Investigations Unit conducted by Mark King ("King"). (*Id.* ¶¶ 162-63, 190.) Varvel was unable to interview Officer Bromund, CO II Mendoza, and CO II Marshall due to their voluntary resignations, but he interviewed Officers Hurst and Elvey, reviewed the video of Yeager's housing unit from the day of the assault, reviewed Deputy Warden Monson's investigation, and reviewed the journal kept by CO II Marshall documenting the security checks that occurred throughout the day. (*Id.* ¶¶ 164-67.) Varvel's report concluded that notes of seven security walks were falsely entered into the journal, that these walks had never been performed, that security walks were not performed as close to every 30 minutes as possible (as required by ADCRR policy), and that there were pervasive violations of ADCRR policies and orders. (*Id.* ¶¶ 169-171.)

As for CO II Mendoza, Varvel concluded that he (1) failed to provide for the safe and orderly operation of his duty post; (2) switched positions with the control room officer, CO II Marshall, without his supervisor's approval; (3) failed to conduct security checks according to policy; (4) failed to remain in constant motion; (5) failed to verify if inmates who entered and exited the housing unit were on the master pass/TOS list; and (6) did not verify where inmates were assigned as they entered the housing unit. (*Id.* ¶ 172.)

As for CO II Marshall, Varvel concluded that he (1) did not properly log security checks; and (2) had logged health and welfare checks that were never conducted. (*Id.* ¶ 173.) Additionally, during an interview with King, CO II Marshall at first denied that he spoke to Inmate Severns on the day of the assault, but after King showed him footage, he stated that he spoke to Inmate Severns about Yeager, that he was "going to activate [ICS]," and that he did not know why he would allow Inmate Severns to talk him out of initiating an ICS. (*Id.* ¶¶ 191-94.)

---

measures. Regardless, the Court has not relied on this evidence in resolving the summary judgment motions.

As for Officer Elvey, Varvel concluded that he (1) opened Yeager's door and kept it open, resulting in multiple inmates entering and exiting the cell; (2) failed to verify if Yeager was on a master pass or TOS system list; (3) failed to verify if inmates entering and exiting the housing unit were on the master pass or TOS system list; (4) kept Yeager's door open for over two hours; and (5) allowed inmates to cross from the east side of the housing unit to the west side of the unit, resulting in Yeager's assault. (*Id.* ¶ 179.) Additionally, Officer Elvey admitted to Varvel that it was his job to make sure that Yeager's door was closed and secured. (*Id.* ¶ 175.)

As for Officer Hurst, he admitted during an interview with Varvel that he did not check whether Yeager was alive and breathing during his 9:06 a.m. security walk; that he knew there were doors open on the day of the attack but was not sure what to do about it, so he did nothing; and that although he was not authorized to open cell doors on his own, he and Officer Bromund would sometimes open and close cell doors when the key officer was not in the building. (*Id.* ¶¶ 180-88.)

During these interviews, officers variously testified that the unit did not generally operate in accordance with policy. (*Id.* ¶ 210.) For example, CO II Mendoza testified that post orders were "not how we did it in practice" and although policies required officers to remain in constant motion, "in practice, we didn't do constant motion. We did once an hour." (*Id.*) Officer Elvey testified that inmates should be accompanied by officers when they left their cells but "I've never seen it done 100% correctly." (*Id.*) Officer Bromund testified that although policies require cell doors to be closed "if the cell is never open, nothing would ever get done" and that although inmates weren't allowed to enter other inmates' cells, Officer Bromund saw it happen daily and was told by CO II Mendoza "that's just part of the deal, part of the way they were running the floor." (*Id.*)

## SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The

movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**DISCUSSION**

I.   Count One

A.   **Overview**

In Count One of the complaint, Plaintiffs assert a § 1983 claim against the five individual Defendants, alleging that each of them "violated the Eighth Amendment . . . by being deliberately indifferent to the safety and well-being of [Yeager] as set forth above."

1   (Doc. 1-3 ¶¶ 55, 58.)[8]

2        Although Plaintiffs' briefing is not a model of clarity on this issue, Plaintiffs' theory

3   appears to be that the individual Defendants were deliberately indifferent to Yeager's

4   safety and well-being (and thus violated the Eighth Amendment) in two distinct ways: *first*,

5   by failing to protect Yeager from the attack by the other inmates (Doc. 306 at 29 ["[F]ederal

6   courts consistently recognize that prison officials violate an inmate's clearly established

7   right to safety and freedom from inmate-on-inmate assault when the officers are

8   deliberately indifferent to prison conditions that pose an excessive risk of harm."]); and

9   *second*, by failing to provide medical and other assistance to Yeager following the attack

10  (*id.* at 22-23 ["Dr. Dragovic also concluded that the fact that [Yeager] had been left without

11  assistance for so long was the cause of [Yeager's] death . . . .  [I]f [Yeager's] injuries had

12  been addressed within a reasonable amount of time, he more likely would have recovered

13  from his head injuries"].)[9]  Some Defendants also appear to interpret Count One in this

14  fashion.  (*See, e.g.,* Doc. 282 at 7-8 [CO II Mendoza's motion, separately addressing the

15  standards for a "Failure to Protect" claim under the Eighth Amendment and a "Deliberate

16  Indifference to Serious Medical Needs" claim under the Eighth Amendment].)

17       The Court agrees that this is the appropriate way to conceptualize Count One.  In

18  *Lemire v. Cal. Dep't of Corrections & Rehabilitation*, 726 F.3d 1062 (9th Cir. 2013), the

19  Ninth Circuit addressed a somewhat analogous situation.  There, two supervisory prison

20  officials (Sisto and Neuhring) chose to convene a staff meeting that resulted in the absence

21  of all floor officers, for a period of more than three hours, from a building that housed an

22  inmate (St. Jovite) who, "[d]uring his incarceration, was treated for depression, anxiety,

23  panic attacks, and early stages of agoraphobia . . . [and] stated that his 'daily life [was]

24

25  [8]      Although the complaint also names the State as a defendant with respect to Count
    One (Doc. 1-3 at 6), the State has now moved for summary judgment on that claim (Doc.
26  260 at 6-7) and Plaintiffs concede in their response that the State "is not liable under 42
    U.S.C. § 1983 because it is not a 'person' as defined by the statute."  (Doc. 306 at 23 n.208.)
27  Accordingly, the State's motion as to Count One is granted.

28  [9]      Similarly, in the Rule 26(f) report, Plaintiffs characterized the nature of the case as
    follows: "Plaintiffs allege that Defendants' acts and omissions *leading up to and following*
    his assault resulted in Mr. Yeager's death."  (Doc. 13 at 2, emphasis added.)

almost unmanageable.'" *Id.* at 1068-69. During this unsupervised period, St. Jovite attempted to commit suicide. *Id.* The first two floor officers to discover St. Jovite following the suicide attempt (Cahoon and Holliday) failed to perform CPR and otherwise "delayed administering aid to St. Jovite, while St. Jovite was unconscious, unresponsive, and purplish in color on the floor." *Id.* at 1082. In an ensuing § 1983 action, St. Jovite's estate and family members sued an array of prison officials "for alleged violations of the Eighth Amendment" and the district court granted summary judgment in favor of all defendants. *Id.* at 1068. The Ninth Circuit reversed in part, holding that (1) there was "a triable issue of fact as to whether Sisto and Neuhring were deliberately indifferent to St. Jovite's *safety and welfare* when one or both decided to convene two back-to-back staff meetings resulting in a lack of supervision in Building 8 for a period of up to three and a half hours"; and (2) there was also "a triable issue of fact as to whether Cahoon and Holliday were deliberately indifferent to St. Jovite's potentially *serious medical need* when they failed to administer CPR prior to the arrival of prison medical staff." *Id.* at 1086 (emphases added). Notably, the Ninth Circuit analyzed each set of claims under a different legal framework. As for the "safety and welfare" claims against Sisto and Neuhring, the court applied the standards established in *Farmer v. Brennan*, 511 U.S. 825 (1994), and its progeny. As for the "serious medical needs" claims against Cahoon and Holliday, the court applied the standards established in *Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006), and its progeny.[10]

The same approach is warranted here. Indeed, as discussed in more detail below, distinguishing between these two theories of liability is particularly necessary when addressing the second prong of the qualified immunity analysis (which requires a detailed analysis of the legal landscape at the time of the incident) and when addressing the issue

---

[10] Similarly, in *Berg v. Kincheloe*, 794 F.2d 457 (9th Cir. 1986), the Ninth Circuit observed that although "a case involving a prisoner's safety from attacks by other prisoners" is "analogous to a case in which a prisoner-patient seeks but is denied relief from an infirmity" and that the "similarities" between the two types of cases are "obvious" (in part because "in both cases, liability is measured by the 'deliberate indifference' standard"), there are also differences between the two types of claims. *Id.* at 461-62.

1    of causation.

2          **B.**     **Failure To Protect Yeager From An Inmate-On-Inmate Attack**

3                **(Deliberate Indifference To Safety And Welfare)**

4             1.   <u>Legal Standard</u>

5       "The Eighth Amendment imposes a duty on prison officials to protect inmates from

6    violence at the hands of other inmates." *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir.

7    2015). "It is not, however, every injury suffered by one prisoner at the hands of another

8    that translates into constitutional liability for prison officials responsible for the victim's

9    safety." *Farmer*, 511 U.S. at 834. Instead, "a prison official violates the Eighth

10   Amendment only when two requirements are met." *Id.*

11      "First, the deprivation alleged must be, objectively, sufficiently serious . . . . For a

12   claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated

13   under conditions posing a substantial risk of serious harm." *Id.* "The objective question

14   of whether a prison officer's actions have exposed an inmate to a substantial risk of serious

15   harm is a question of fact, and as such must be decided by a jury if there is any room for

16   doubt." *Lemire*, 726 F.3d at 1075-76.

17      "The second requirement follows from the principle that only the unnecessary and

18   wanton infliction of pain implicates the Eighth Amendment. [Thus], a prison official must

19   have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is

20   one of deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834 (cleaned

21   up). "In other words, the official must both be aware of facts from which the inference

22   could be drawn that a substantial risk of serious harm exists, and he must also draw the

23   inference." *Cortez*, 776 F.3d at 1050 (internal quotation marks omitted). "Deliberate

24   indifference is something more than mere negligence but something less than acts or

25   omissions for the very purpose of causing harm or with knowledge that harm will result."

26   *Id.* (internal quotation marks omitted). "A prison official's deliberate indifference may be

27   established through an inference from circumstantial evidence or from the very fact that

28   the risk was obvious." *Id.* (internal quotation marks omitted).

Finally, a plaintiff asserting an Eighth Amendment-based failure-to-protect claim "must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries." *Lemire*, 726 F.3d at 1074.

### 2. The Parties' Arguments

Although the five individual Defendants' summary judgment motions raise an array of different arguments that do not always overlap, each individual Defendant argues that he is, at a minimum, entitled to summary judgment under the second prong of the qualified immunity standard because there was no clearly established law as of February 24, 2020 showing that the conduct at issue here violated the Eighth Amendment. (Doc. 249 at 11-14 [Officer Bromund]; Doc. 258 at 13-15 [Officer Hurst]; Doc. 269 at 7-8 [Officer Elvey]; Doc. 282 at 14-15 [CO II Mendoza]; Doc. 285 at 9-11 [CO II Marshall].)

In response, Plaintiffs identify the following seven cases as supplying the clearly established law supporting their claim in Count One: (1) *Farmer*; (2) *Barefield v. Dunn*, 688 F. Supp. 3d 1026 (M.D. Ala. 2023); (3) *Cortez v. Skol*, 2016 WL 3658954 (D. Ariz. 2016); (4) *Dickinson v. Cochran*, 833 F. App'x 268 (11th Cir. 2020); (5) *Green v. Padilla*, 484 F. Supp. 3d 1098 (D.N.M. 2020); (6) *Wilson v. Dunn*, 618 F. Supp. 3d 1253 (N.D. Ala. 2022); and (7) *Moaddab v. Cnty. of Orange*, 2019 WL 1751841 (C.D. Cal. 2019). (Doc. 306 at 29-34.) Additionally, earlier portions of Plaintiffs' brief seem to identify the Ninth Circuit's decisions in *Lemire* and *Cortez* as providing further support for Count One. (*Id.* at 23-29.) Alternatively, Plaintiffs argue that "qualified immunity may even be denied in novel circumstances." (*Id.* at 34-35.)

### 3. Analysis

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Courts "have discretion to address the 'clearly established' prong of the qualified immunity test first; if [they] conclude that the relevant law was not clearly established, [they] need not address the other prong concerning

the underlying merits of the constitutional claim." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (internal quotation marks omitted). The Court will exercise its discretion to begin with the clearly established prong here because, as discussed below, it is dispositive as to the failure-to-protect component of Count One.

A government official's conduct violates clearly established law when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft,* 563 U.S. at 741 (cleaned up). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (cleaned up); *West v. City of Caldwell*, 931 F.3d 978, 983 (9th Cir. 2019) ("[W]e must locate a controlling case that squarely governs the specific facts at issue, except in the rare obvious case in which a general legal principle makes the unlawfulness of the officer's conduct clear despite a lack of precedent addressing similar circumstances.") (cleaned up). "The plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (cleaned up).

As for the "particular conduct" underlying the failure-to-protect claim in this case, only the acts and omissions by the Individual Defendants that occurred before 9:00 a.m. could have contributed to the attack on Yeager—it is undisputed that the attack occurred at 9:00 a.m. and there is no suggestion (let alone evidence) that Yeager was subjected to another attack afterward. Thus, acts and omissions that occurred after 9:00 a.m. have no causal relationship with the attack itself. *Lemire*, 726 F.3d at 1074 ("[P]laintiffs alleging

deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries."). *See generally Ambassador Hotel Co., Ltd. v. Wei-Chuan Invest.*, 189 F.3d 1017, 1029 (9th Cir. 1999) ("[T]o have been the cause (or one cause) of a particular event, any given factor must have contributed to the actual outcome; events which occur after the injury has occurred cannot be said to have caused the injury."). Construed in the light most favorable to Plaintiffs, the evidence shows that before 9:00 a.m. on February 24, 2020, various cell doors in Yeager's cell block were left open without explanation (in violation of prison policy); inmates were allowed to move in an unrestricted manner between cells (in violation of prison policy); and inmate counts and checks were not conducted according to prison policy. Additionally, although Yeager had no documented history of fights or assaults with other inmates while incarcerated at ASPC-Florence, a reasonable jury could find that Defendants were generally aware on February 24, 2020 of the need for protect against inmate-on-inmate violence, both due to the nature of the inmates in Yeager's "close custody" unit and due to the Daily Briefing Sheet, which stated that there were "[l]ots of assaults lately," cautioned prison personnel to "be mindful of situational awareness," "[w]atch for inmates acting funny," and "DO NOT BECOME COMPLACENT," and instructed that "[a]ll gates and doors will be secured at all times. This includes cell doors." (Doc. 302-1 at 266.)[11]

Even still, none of Plaintiffs' cited cases would have alerted Defendants that, as of February 24, 2020, the challenged conduct was prohibited by the Eighth Amendment. As an initial matter, although Plaintiffs contend that as many as nine decisions supply the clearly established law supporting their failure-to-protect claim, only three of those cases (*Farmer*, *Cortez*, and *Lemire*) are prior decisions by the Ninth Circuit or the Supreme Court. *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be

---

[11]    Although various Defendants deny having reviewed or otherwise been made aware of the Daily Briefing Sheet on February 24, 2020, there is evidence that it was customary for officers to be informed of the information within the Daily Briefing Sheet at the beginning of each shift. (Doc. 302 ¶ 62.)  Accordingly, a factfinder must decide whether to accept Defendants' denials.

embraced by a 'consensus' of courts outside the relevant jurisdiction.") (citation omitted); *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority."). Additionally, Plaintiffs' fourth cited case is simply the district court's unpublished decision following the remand from the Ninth Circuit in *Cortez*. Plaintiffs' five remaining cited cases (*Barefield*, *Dickinson*, *Green*, *Wilson*, and *Moaddab*) are unpublished decisions that were not issued by the Supreme Court or Ninth Circuit. Additionally, four of those cases (*Barefield*, *Dickinson*, *Green*, and *Wilson*) were decided after February 24, 2020. As such, they do not support Plaintiffs' position under the second prong of the qualified immunity analysis. *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) ("[C]ases . . . that postdate the conduct in question . . . could not have given fair notice . . . and are of no use in the clearly established inquiry.").

Turning back to *Farmer*, *Cortez*, and *Lemire*, each of those cases involved a failure-to-protect claim arising under markedly dissimilar factual circumstances. In *Farmer*, the claim arose after prison officials placed the plaintiff in the "general population [of the prison] despite knowledge that the penitentiary had a violent environment and a history of inmate assaults, and despite knowledge that [plaintiff], as a transsexual who projects feminine characteristics, would be particularly vulnerable to sexual attack by some . . . inmates." *Farmer*, 511 U.S. at 830-31. In *Cortez*, the claim arose after a single officer in a "detention unit [that] housed a volatile mix of prisoners" chose to transport "three mutually hostile, half-restrained, high-security inmates by himself through an isolated prison passage known as 'no man's land,'" resulting in an attack by two of the inmates (Cruz and Lavender) on the third (Cortez). *Cortez*, 776 F.3d at 1048. The officer knew that failing to place full restraints on the three inmates violated prison policy, "knew about the hostility between the [three] inmates" beforehand, and was aware "of dangers specific to" Cortez due to his perceived status "as a protective custody inmate," because "it was common knowledge among prison guards that such inmates are targeted for attack by other prisoners." *Id.* at 1048-52. Finally, as discussed in more detail above, the claim in *Lemire*

arose after supervisory prison officials chose to remove all of the floor officers for a period of more than three hours, which enabled an inmate with well-documented mental health issues to attempt to commit suicide. *Lemire*, 726 F.3d at 1068-69.

As several of the individual Defendants note in their reply briefs,[12] *Farmer*, *Cortez*, and *Lemire* are factually distinguishable from this case because they involved prison officials' failure to protect a specific inmate from a particularized, known danger, whether due to the inmate's transsexuality (*Farmer*)[13] or perceived status as a protective-custody inmate (*Cortez*) or mental health issues (*Lemire*).[14]  As courts have noted, this is the more common type of failure-to-protect claim in the prison context. *Barefield*, 688 F. Supp. 3d

---

[12]    Doc. 328 at 11 (CO II Mendoza); Doc. 330 at 3-4, 8 (Officer Elvey); Doc. 331 at 8-9 (Officer Bromund); Doc. 332 at 9-10 (Officer Hurst).

[13]    Although *Moaddab* does not qualify as clearly established law for the reasons stated above, it is also factually dissimilar to this case because, like *Farmer*, it involved jail officials' failure to protect a specific detainee who was known to be at a heightened risk of attack by virtue of his status. *Moaddab*, 2019 WL 1751841 at *6 ("The Classification Team identified Moaddab as at heightened risk of attack by other inmates due to his sexual orientation, just as the transgender plaintiff in *Farmer* was identified as at heightened risk of violence.").

[14]    Although not cited by Plaintiffs, other Ninth Circuit decisions allowing failure-to-protect claims to proceed have also involved prison officials' failure to protect a specific inmate who was known to be vulnerable to attack. *Wilk v. Neven*, 956 F.3d 1143, 1146 (9th Cir. 2020) (prison officials rejected the plaintiff's request to be "moved . . . to administrative segregation for his protection" after another inmate "threatened to attack and kill [him]" and the other inmate then "attacked [the plaintiff] with stones, gravel, and his fists"); *Fierro v. Smith*, 731 F. App'x 652, 653-54 (9th Cir. 2018) (prison officials denied the plaintiff's "requests for protective custody . . . six times between 2011 and 2013," even though the plaintiff "claimed throughout that time that he faced a statewide threat from the Border Brothers prison gang, who have members in each of the prison units in the ASPC, and that he was therefore in danger in any general population unity within the ASPC," and "[s]hortly after his sixth request for PC was denied, [the plaintiff] was seriously assaulted by another prison inmate"); *Armstead v. Fields*, 638 F. App'x 601, 603 (9th Cir. 2016) (prison officials rejected the plaintiff's request to be moved to a different cell, even though they knew the plaintiff's cellmate had stated "three times that he could not be placed with 'blacks'" and the plaintiff "told them that he was 'in harm's way' and that [his cellmate] had already made physical contact with him, and begged not to be left in the cell," and the cellmate then attacked the plaintiff); *Clem v. Lomeli*, 566 F.3d 1177, 1180 (9th Cir. 2009) (prison official rejected the plaintiff's request to be moved to a different cell because his cellmate "was drunk and threatening to kill him" and the cellmate then "severely beat[] [the plaintiff], breaking his jaw and knocking him unconscious"). *See also Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1064 (9th Cir. 2016) (affirming jury's determination that jail officials violated the plaintiff's "due process right as a pretrial detainee to be protected from harm at the hands of other inmates" where jail officials "ignored [the plaintiff's] attempts to seek help," which included "bang[ing] on the cell's window trying to attract attention," after "a combative inmate who had been arrested on a felony charge" was placed in the plaintiff's cell).

at 1063 ("[T]he more common type of Eighth Amendment failure-to-protect, deliberate indifference claim [is] based on specific, or individualized, threats posed by certain inmates or groups of inmates to a specific plaintiff or class of inmates like plaintiff.").  Here, in contrast, it is undisputed that Defendants did not have any reason to believe Yeager was "particularly vulnerable to . . . attack." *Farmer*, 511 U.S. at 831.  Instead, Plaintiffs' theory is that Defendants created lax security conditions (in violation of prison policy) that, at least in light of the nature of the inmates housed in Yeager's cell block and the warnings set forth in the Daily Briefing Sheet, amounted to deliberate indifference to the safety needs of *all* of the inmates in Yeager's cell block.  This is sometimes referred to "as a generalized failure-to-protect claim or an excessive-inmate-violence claim." *Barefield*, 688 F. Supp. 3d at 1064.

Without in any way approving the deplorable security conditions in place on February 24, 2020, the Court cannot say that *Farmer*, *Cortez*, and *Lemire* would have "ma[d]e it obvious to all reasonable government actors, in [each Defendant's] place, that what he is doing violates federal law." *Shafer*, 868 F.3d at 1117.  Because none of those cases involved a generalized failure-to-protect claim, they did not impart notice to Defendants that the specific conduct at issue here violated the Eighth Amendment.  *Cf. King v. Riley*, 76 F.4th 259, 266-68 (4th Cir. 2023) (granting qualified immunity to a prison guard, where the plaintiff's theory was that the guard "knew" that the general "risk of inmate violence was substantial" and that the guard's "efforts to mitigate that risk . . . were constitutionally deficient" and may have "knowingly violat[ed] a prison policy," because the plaintiff failed to "point to any analogous cases establishing this specific right").

The lack of notice is further underscored by the fact that some individual aspects of the challenged conduct at issue here had not, by February 24, 2020, been deemed unconstitutional.  For example, although Plaintiffs fault Defendants for their failure to perform direct-view safety checks in compliance with prison policy, the Ninth Circuit did not recognize "a constitutional right to direct-view safety checks" until July 2021 and clarified that this "right was not clearly established" until then. *Gordon v. Cnty. of Orange*,

6 F.4th 961, 965 (9th Cir. 2021).[15]  Separately, although Plaintiffs fault Defendants for leaving various cell doors open in violation of prison policy, many courts have recognized that "unlocked cell doors, by themselves, are not" necessarily unconstitutional.  *Oden v. True*, 2020 WL 4049922, *3 (S.D. Ill. 2020).  *See also Anderson v. Hairabedian*, 2022 WL 1411784, *3 (6th Cir. 2022) ("Anderson . . . did not sufficiently allege deliberate indifference based on Shorter's electronically opening his and Smith's cell doors at the same time, resulting in a fight between them."); *Walton v. Dawson*, 752 F.3d 1109, 1120 (8th Cir. 2014) (noting that "[w]hether unlocked cell doors pose an unconstitutional risk to detainees . . . is always a factual question dependent on the totality of the specific prison's circumstances and the prison officials' awareness of the risk" and that "[t]here is no sweeping constitutional rule that every cell in every prison must be locked as soon as the sun sets"); *Bennett v. Washington*, 2015 WL 731227, *11 (E.D. Pa. 2015) ("[T]here is insufficient record evidence to establish that Plaintiff's unlocked cell door created a substantial risk of inmate-on-inmate attack, much less that there was such an obvious, substantial risk that a jury could infer that COs Neal and Washington and Sergeant White must have known of it."); *Burton v. Kindle*, 401 F. App'x 635, 638 (3d Cir. 2010) ("Burton has failed to allege that Smith behaved with deliberate indifference in unlocking Burton's cell.").[16]

---

[15]    Additionally, *Gordon* only recognized this right in the context of "pretrial detainees" and explained that such checks must be "sufficient to determine whether their presentation indicates the need for medical treatment."  *Gordon*, 6 F.4th at 973.  This case, in contrast, involves a prison inmate (whose rights under the Eighth Amendment are not coextensive with the rights of pretrial detainees under the Fourteenth Amendment).  Additionally, Plaintiffs do not explain how the absence of safety checks has any bearing on the causation analysis related to their failure-to-protect claim (as opposed to their failure-to-provide-medical-treatment claim).  It is undisputed that the assault occurred very quickly.

[16]    To be clear, it is well established that a prison official may not intentionally unlock a particular inmate's cell door in order to enable an attack by other inmates.  *See, e.g.*, *Pavlick v. Mifflin*, 90 F.3d 205, 208 (7th Cir. 1996) ("[A]lthough this case was litigated as one of deliberate indifference, Pavlick's allegations appear to go beyond simple 'indifference' to his safety.  Viewing the evidence in the light most favorable to the verdict (as we must), a reasonable jury could have inferred that, by opening Pavlick's cell door and allowing the attackers to enter, Mifflin actually participated in the assault.").  But there is no evidence of such intentional conduct here.  Although Plaintiffs are correct that "[i]ntent is usually an issue of fact that . . . can be inferred from circumstantial evidence" (Doc. 306 at 36-37), no reasonable jury could find that the various security failures at issue

What is left, then, is a claim that the overall set of security conditions created through Defendants' collective[17] acts and omissions before 9:00 a.m. on February 24, 2020—which consisted of leaving certain cell doors open, allowing inmates to move in an unrestricted manner through the unit, and not performing regular safety checks, all in violation of prison policy—created a lax security environment that violated the Eighth Amendment rights of all of the inmates in Yeager's cell block, at least in light of Defendants' general awareness of the danger posed by the "close custody" inmates in that cell block and awareness based on the Daily Briefing Sheet that there had been "[l]ots of assaults lately." However, no Ninth Circuit or Supreme Court case had recognized by February 24, 2020 that such a set of conditions violates the Eighth Amendment and at least some of the challenged conditions were not, on their own, recognized as necessarily unconstitutional at that time.[18]

___

were the result of an intentional plan by some unspecified Defendant (or group of Defendants) to allow Yeager to be assaulted.

[17] As several Defendants note, Plaintiffs' response brief often "does little more than lump every defendant into the same claims that they were deliberately indifferent, without regard for any specific act that they took or did not take" (Doc. 332 at 6) and seems to "assert that the defendants should be collectively held liable for failing to prevent Yeager's assault at 9:00 a.m.—regardless of each officer's individual role" (Doc. 331 at 5). This approach is particularly impermissible with respect to the failure-to-protect claim. To prevail on such a claim, Plaintiffs would need to provide a "very individualized" and fact-intensive analysis of the security-related acts and omissions for which each Defendant was responsible, then show (among other things) that each individual Defendant's acts and omissions had a causal relationship with the attack at 9:00 a.m. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) ("[T]he causation inquiry . . . must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the stabbing incident, but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. Especially when, as in this case, a prisoner seeks to hold a prison employee individually liable because another prisoner attacked him, the prisoner must establish individual fault."). However, Plaintiffs make no effort to provide such an analysis in the portion of their response brief addressing the issue of causation. (Doc. 306 at 38-39.) As a result, at least some individual Defendants would likely also be entitled to summary judgment on the failure-to-protect component of Count One due to a lack of causation. For example, Officer Bromund moved for summary judgment on this basis (Doc. 249 at 10-11) and correctly notes in his reply that "it is undisputed [he] was working in an entirely different part of the building and was not involved in any of the security walks that were performed in Mr. Yeager's run prior to the assault" (Doc. 331 a 6). Nevertheless, because all of the individual Defendants are entitled to qualified immunity with respect to the failure-to-protect component of Count One, it is unnecessary to perform a more refined, Defendant-by-Defendant causation analysis as to the failure-to-protect component of Count One.

[18] The Court acknowledges that, in *Barefield*, the district court determined that there

Of course, "there need not be a case directly on point, or even one with fundamentally similar facts." *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 898 (9th Cir. 2024) (cleaned up).  *See generally Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.  The same is true of cases with 'materially similar' facts."); *Scott v. Smith*, 109 F.4th 1215, 1229 (9th Cir. 2024) ("Plaintiff need not identify a factual twin.").  But the issue here, at least in the Court's estimation, is that the factual differences between Plaintiffs' cited controlling authorities and this case are marked and significant. Defendants are not accused of failing to protect a specific inmate who was known to be vulnerable—as was the case in *Farmer*, *Cortez*, *Lemire*, and the many additional failure-to-protect cases identified in footnote 14 above—but rather of creating lax security conditions that exposed all of the inmates in Yeager's cell block to an impermissible risk of attack by other inmates.  When, as here, a plaintiff fails to identify any "direct case law" recognizing the unconstitutionality of the challenged conduct "at the time" of the conduct, and when "the facts" of the plaintiff's cited cases "are distinguishable," the Ninth Circuit has held that qualified immunity must be granted.  *Manriquez v. Ensley*, 46 F.4th 1124, 1131-32 (9th Cir. 2022).  *See also City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 12-13 (2021) ("It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . .  [T]he decisions relied upon by the Court of Appeals . . . [involved] facts . . . dramatically different from the facts here."); *Shooter*, 4 F.4th at 962 (emphasizing that "the clearly established law must be particularized to the

---

was clearly established law to support the plaintiff's generalized failure-to-protect claim. 688 F. Supp. 3d at 1091-96.  However, because *Barefield* is not a "controlling authority" and was not decided until 2023, it cannot supply the sort of clearly established law required here.  Additionally, although *Barefield* understandably relied on Eleventh Circuit law for purposes of its analysis, Eleventh Circuit law is not controlling for present purposes.  *Cf. Pachote Johnson v. Nelson*, 2024 WL 5153593, *1 (9th Cir. 2024) ("In support of her claim that the law was clearly established, Plaintiff cites only an unpublished memorandum that postdates the conduct at issue and a single out-of-circuit opinion.  Neither could clearly establish the law governing Nelson's conduct . . . .").

facts of the case" and concluding that defendants were entitled to qualified immunity because the plaintiff "relies on cases that arose in factual contexts that differ from" the present case) (cleaned up).

Notwithstanding this, Plaintiffs argue that qualified immunity should be denied because, "[s]ince *Farmer*, federal courts consistently recognize that prison officials violate an inmate's clearly established right to safety and freedom from inmate-on-inmate assault when the officers are deliberately indifferent to prison conditions that pose an excessive risk of harm." (Doc. 306 at 29.) However, this is nothing more than a generalized articulation of the deliberate-indifference standard as it applies in the failure-to-protect context, and courts "must take care not to define the clearly established law at a high level of generality because doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Manriquez*, 46 F.4th at 1131 (cleaned up). Thus, in *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002), the Ninth Circuit rejected a similar argument. There, an inmate in a psychiatric unit of a state prison (Ford) was killed after he was "double-celled" with another inmate (Diesso) who had a long history of violent attacks on other inmates. *Id.* at 1045-47. The Ninth Circuit resolved the first step of the qualified immunity analysis in the plaintiff's favor, holding that "if any of the officers knew that Diesso was acting out dangerously with cellmates or that he was a threat to Ford but housed Ford with him anyway, this would violate the Eighth Amendment." *Id.* at 1050. For purposes of the second step of the qualified immunity analysis, the plaintiff seemed to argue—just as Plaintiffs argue here— that *Farmer* supplied the necessary "clearly established" law because it made "clear to a reasonable prison official that if he knew about an excessive risk to inmate safety, and inferred from the facts of which he was aware that a substantial risk of serious harm exists, he would violate the law by disregarding it." *Id.* The Ninth Circuit disagreed, explaining that "it is not sufficient that *Farmer* clearly states the general rule that prison officials cannot deliberately disregard a substantial risk of serious harm to an inmate." *Id.* at 1050-51. And because "neither *Farmer* nor subsequent authorities ha[d] fleshed out" whether

the particular conduct at issue—"double-celling psychiatric inmates"—"changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm," the Ninth Circuit concluded that all of the defendants were entitled to qualified immunity: "Although [the defendants' conduct] turned out to be quite unfortunate judgments, we cannot say that a reasonable correctional officer would have clearly understood that the risk of serious harm was so high that he should not have authorized the double-celling." *Id.* at 1051.

Plaintiffs' final argument is that even in the absence of an analogous controlling precedent, qualified immunity may be denied "in novel circumstances," such as where the constitutional violation is obvious. (Doc. 306 at 34.) Although Plaintiffs are correct that "[i]n the absence of analogous case law, a plaintiff can nevertheless surmount the clearly-established-law requirement by demonstrating instead that the constitutional violation was obvious," Plaintiffs overlook that "such cases are extraordinarily rare." *Perez v. City of Fresno*, 98 F.4th 919, 927 (9th Cir. 2024) (cleaned up). This is not such an extraordinarily rare case, as Plaintiffs have not identified any controlling authority from the Supreme Court or Ninth Circuit upholding a generalized failure-to-protect claim (let alone upholding such a claim under similar facts), at least some aspects of the challenged conduct (*i.e.,* failing to complete security checks and leaving cell doors open) were not necessarily unconstitutional as of February 24, 2020, and the Ninth Circuit has declined to invoke the obviousness exception in other failure-to-protect cases involving highly questionable security measures (*Estate of Ford*).

## C. **Failure To Provide Assistance To Yeager Following The Attack (Deliberate Indifference To Serious Medical Needs)**

### 1. Legal Standard

"To set forth a constitutional claim under the Eighth Amendment predicated upon the failure to provide medical treatment, first the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, a plaintiff must show the defendant's response to the need was deliberately indifferent." *Lemire*, 726 F.3d

at 1081.  "The deliberate indifference prong requires (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference."  *Id.* (cleaned up).  "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment . . . .  The indifference to a prisoner's medical needs must be substantial.  Mere indifference, negligence, or medical malpractice will not support this claim.  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs."  *Id.* (cleaned up).

> ### 2.    Defendant-By-Defendant Analysis

> #### a.    **Officer Bromund**

Officer Bromund first argues that he cannot be held liable for failing to provide medical or other assistance to Yeager following the attack because "there is no evidence that [he] knew of any serious risk to Yeager's health during either his 2:42 p.m. security walk or his 3:22 p.m. security walk.  There is no evidence, for example, that [he] *knew* Yeager had been previously assaulted, *knew* Yeager was not breathing or was having trouble breathing, or *knew* Yeager was suffering from a brain injury while he was conducting his walks. . . .  Nor is there any evidence showing that [he] was made aware of Yeager's condition through any other means prior to ICS being initiated.  Of course, evidence to that effect might raise an issue of deliberate indifference.  But, there is no such evidence, circumstantial or otherwise, in this case."  (Doc. 249 at 9-10.)  In response, Plaintiffs identify various reasons why a reasonable jury could find that Officer Bromund was aware of the serious risk to Yeager's health, including that Yeager's "whole head was still bloody when ICS was eventually called at 4:17 p.m., suggesting that [Yeager's] injuries—and the blood that would have pooled around him—were continuously obvious from 9:00 a.m. until ICS was called seven hours later."  (Doc. 306 at 20.)

Plaintiffs have the better of this argument.  Construed in the light most favorable to Plaintiffs, a reasonable jury could conclude that although inmates made several attempts to clean up Yeager and Yeager's cell after the assault at 9:00 a.m., Yeager's injuries nevertheless would have been visible to anyone who looked into his cell between 9:00 a.m.

and 4:16 p.m.  For example, Inmate Severns contends that when he looked into Yeager's cell at 9:30 a.m., Yeager was lying on the floor, unresponsive, in a pool of blood with obvious injuries.  It is undisputed that Yeager was also covered in blood and lying in a pool of vomit when officers first claim to have noticed his injuries at 4:16 p.m.  Additionally, during the post-incident investigation, King expressed incredulity at the notion that any observer could have overlooked Yeager's injuries, making such statements as "how can you not see the split skull, his eye was split open, the blood all on the pillow?" and "[n]o one, my grandmother, who's half blind, wouldn't see that."  (Doc. 302 ¶¶ 201-02.)

This determination is significant because Officer Bromund looked into Yeager's cell at or around 2:42 p.m. and then made conflicting statements about what he observed, eventually stating that he was able to confirm Yeager's living, breathing flesh because he saw Yeager's chest movement.  Additionally, after looking into Yeager's cell, Officer Bromund made gestures toward Yeager's cell while speaking with CO II Mendoza.  Finally, Officer Bromund was scheduled to conduct another security check of Yeager's cell around 3:22 p.m. but stopped short of Yeager's cell and then provided an explanation for this omission (*i.e.*, he had been called away by CO II Mendoza "or another officer" for a training exercise) that was not corroborated by CO II Mendoza, who denied calling Officer Bromund away for a training exercise.

A reasonable jury could conclude, based on this evidence, that Officer Bromund observed Yeager's injuries during the 2:42 cell check but then did nothing to provide assistance.  The reasonableness of this potential conclusion is underscored by the fact that Officer Bromund engaged in various unusual actions after looking into the cell at 2:42 p.m., including making gestures to CO II Mendoza toward Yeager's cell, declining to look into Yeager's cell during the next security walk, and providing an uncorroborated explanation for that omission.  Of course, there may be benign explanations for those actions, but a reasonable jury considering all of this evidence could choose to disbelieve Officer Bromund's claim that he was subjectively unaware of Yeager's injuries and need for medical assistance.

Officer Bromund next argues that "there is no evidence that [he] proximately caused either Yeager's alleged injuries or his death. Nor is there any admissible evidence that [his] conduct deprived Yeager of a chance at recovery at either 2:42 p.m. or 3:22 p.m. that day. Simply put, there is no admissible evidence indicating that had [he] done things differently at either 2:42 p.m. or 3:17 p.m. (5–6 hours after the assault), Yeager would likely be alive today." (Doc. 249 at 10-11.)

This argument lacks merit. One of Plaintiffs' experts, Dr. Sharma, a neurosurgeon, opined in relevant part that:

> [Yeager] likely aspirated or inhaled vomit or blood throughout the day on February 24, 2020 as suggested by bilateral rhonchi when his breath sounds were initially assessed, and as confirmed by Chandler Regional's diagnosis of aspiration pneumonia (i.e., the presence of fluid in his lungs). This establishes that Mr. Yeager respirations and oxygenation were impaired by the presence of fluid in his lungs and prevented a sufficient amount of oxygen from reaching his brain. Furthermore, the injured brain tissue swells as the body attempts to repair the area by providing more blood flow. Unfortunately, for Mr. Yeager, his overall oxygenation as well as his blood flow were both compromised due to cerebral edema and a secondary decrease in overall oxygenation and hypoxia due to his lung aspiration. In short terms, time is brain, and the longer Mr. Yeager's brain was deprived of oxygen, the more damage it suffered, and the less likely it became that Mr. Yeager would recover meaningful functioning after his head injury.
>
> . . .
>
> If recognized in a reasonable time frame and his poor oxygenation was recognized and restored, he likely would have recovered reasonably from his diffuse cranial injury. This is further established in the fact that he had normal intracranial pressures; therefore, his presentation and overall poor outcome is more consistent with a hypoxic injury to the brain and the lack of oxygenation did deprive him a reasonable chance at recovery, albeit with some functional limitation.

(Doc. 302-1 at 313.) Construed in the light most favorable to Plaintiffs, Dr. Sharma's opinion serves as evidence that Officer Bromund's failure to provide medical care to Yeager after observing his injuries at 2:42 p.m.—at which time a reasonable jury could conclude that Officer Bromund believed Yeager was still alive, given Officer Bromund's

claim that he observed Yeager's living, breathing flesh during the 2:42 p.m. cell check[19]—was a proximate cause of Yeager's death.

Next, Officer Bromund argues he is entitled to summary judgment under the second prong of the qualified immunity analysis due to the absence of clearly established law. (Doc. 249 at 11-14.)  In support of this argument, Officer Bromund emphasizes that the constitutional right to direct-view safety checks was not clearly established until, at the earliest, the Ninth Circuit's *Gordon* decision in 2021.  (*Id.*)

Officer Bromund is not entitled to qualified immunity because Plaintiffs' claim against him is not premised on the mere absence of safety checks—as noted, there is evidence from which a reasonable jury could conclude that Officer Bromund became subjectively aware of Yeager's injuries during the 2:42 p.m. cell check yet failed to provide medical assistance despite that awareness.  Unlike in relation to Plaintiffs' generalized-failure-to-protect theory of liability, there was ample controlling authority in the Ninth Circuit as of February 24, 2020 establishing that a prison guard violates the Eighth Amendment by failing to provide medical assistance to an injured inmate in need of such assistance.  Among other things, this was the situation as to two of the defendants who were denied qualified immunity in *Lemire*: "The third watch floor officers, Cahoon and Holliday, were the first of the prison personnel to arrive at St. Jovite's cell . . . [but] delayed administering aid to St. Jovite, while St. Jovite was unconscious, unresponsive, and purplish in color on the floor. . . .  As other circuits have held, failing to provide CPR or other life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference."  *Lemire*, 726 F.3d at 1082.

Next, Officer Bromund argues that because "[a]n Eighth Amendment loss of

---

[19]    These facts also help distinguish this case from *Palmer v. Vasquez*, 696 F. App'x 782 (9th Cir. 2017), which Officer Bromund cites in his motion.  (Doc. 249 at 10.)  In *Palmer*, the court found a lack of causation in a prisoner-death case, where the plaintiff's theory of liability hinged on the guards' failure to perform timely "welfare checks," because even "[a]ssuming that Vasquez violated the welfare check policy between 2 pm, when his shift began, and 3:15 pm, when he discovered Smith's death, . . . it is not clear that checking on Smith during that period would have prevented his death, because the county coroner was unable to determine the time at which it occurred."  *Id.* at 785.  Here, in contrast, Yeager was still alive at 2:42 p.m.

familial association claim requires an underlying violation of the family member's constitutional rights," and he "did not violate Yeager's Eighth Amendment rights," it follows that "Plaintiffs' loss of familial association claim accordingly fails." (Doc. 249 at 14.) However, because the Court has now concluded that Officer Bromund is not entitled to summary judgment as to Yeager's Eighth Amendment claim, this argument fails.

Finally, Officer Bromund seeks summary judgment on Plaintiffs' request for punitive damages. (Doc. 249 at 14-15.) This request is denied. For the same reasons that a reasonable jury could find that Officer Bromund was deliberately indifferent to Yeager's serious medical needs in violation of the Eighth Amendment, a reasonable jury could also find that Officer Bromund exhibited "reckless or callous indifference to the constitutional rights of" Yeager, thereby warranting punitive damages. *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).

### b.    **Officer Hurst**

Officer Hurst first argues that he cannot be held liable for failing to provide medical or other assistance to Yeager following the attack because "there is no evidence that [he] was aware of any need for [Yeager] to receive medical treatment. . . . In the two security walks that [he] performed, he did not perceive anything out of the ordinary. No one communicated to [him] that they observed anything out of the ordinary in Yeager's cell, or that he needed assistance. At the 4:16 p.m. formal count, [Officers] Hurst and Bromund—for the first time—saw Yeager lying on the floor, and [Officer] Hurst immediately initiated the ICS." (Doc. 258 at 10-13.)

This argument lacks merit. As discussed in relation to Officer Bromund, a reasonable jury could conclude that Yeager's injuries would have been visible to anyone who looked into his cell between 9:00 a.m. and 4:16 p.m. The evidence shows that Officer Hurst looked into Yeager's cell at 9:07 a.m., mere minutes after the attack, and claims to have verified Yeager's living, breathing flesh during this visit. Officer Hurst also looked into Yeager's cell at 12:52 p.m. and again claims to have verified Yeager's living, breathing flesh during this visit. A reasonable jury could thus conclude that Officer Hurst observed

Yeager's injuries during the 9:07 a.m. and/or 12:52 p.m. cell checks but did nothing to provide assistance afterward.

Officer Hurst's final argument is that he is entitled to summary judgment under the second prong of the qualified immunity analysis due to the absence of clearly established law.  (Doc. 258 at 13-15.)  Like Officer Bromund, Officer Hurst emphasizes that the constitutional right to direct-view safety checks was not clearly established until, at the earliest, the Ninth Circuit's *Gordon* decision in 2021.  (*Id.*)

These arguments fail for the same reasons as Officer Bromund's arguments.  Plaintiffs' claims against Officer Hurst are not premised on the mere absence of safety checks—as noted, there is evidence from which a reasonable jury could conclude that Officer Hurst became subjectively aware of Yeager's serious injuries during the 9:07 a.m. and/or 12:52 p.m. cell checks yet failed to provide medical assistance despite that awareness.  *Lemire* provides the clearly established law showing that such conduct was unlawful on February 24, 2020.

c.    **Officer Elvey**

Among other things, Officer Elvey argues that he is entitled to summary judgment because "there is no evidence to establish that [he] acted with deliberate indifference." (Doc. 269 at 8-11.)  All of Plaintiffs' responsive arguments concern Officer Elvey's duty, as the key officer, to open and close cell doors and his failure to carry out that duty in compliance with prison policy.  (Doc. 306 at 6, 16-18.)  In reply, Officer Elvey repeats some of his earlier arguments while emphasizing that is undisputed that he "was unable to see into Mr. Yeager's cell."  (Doc. 330 at 6, citing Doc. 312 ¶¶ 44-46, 57.)

There is insufficient evidence to hold Officer Elvey liable under a failure-to-provide-medical-treatment theory.  There is no evidence that Officer Elvey ever looked into Yeager's cell and observed Yeager's injuries or was otherwise made aware of Yeager's injuries by the other Defendants.  This is because Officer Elvey, unlike the other individual Defendants, had no responsibility for conducting security checks or looking into cells and, in fact, could not see into Yeager's cell from his vantage point as the key officer.

Because Officer Elvey cannot be held responsible for violating Yeager's Eighth Amendment rights, Officer Elvey's request for summary judgment on Plaintiffs' derivative familial association claims (Doc. 269 at 11) is also granted.

### d.  **CO II Mendoza**

CO II Mendoza argues, in relation to Plaintiffs' failure-to-provide-medical-treatment theory of liability, that he is entitled to summary judgment because he "was not aware that Yeager was in medical distress.  [Officer] Mendoza did not see Yeager bleeding in his cell or on the floor of his cell until ICS was activated.  None of [the other Defendants] told [Officer] Mendoza that Yeager appeared to be in any physical distress or required aid. . . .  The assault occurred at approximately 9:00 AM.  The only time after this when [Officer] Mendoza even went up to the second tier where Yeager's cell was located was at 2:42 PM."  (Doc. 282 at 13-14.)

The analysis as to CO II Mendoza is more complicated than as to Officers Bromund and Hurst because there is no evidence that CO II Mendoza personally looked into Yeager's cell between 9:00 a.m. and 4:16 p.m.  Nevertheless, the Court concludes there is sufficient circumstantial evidence from which a reasonable jury could find that CO II Mendoza was subjectively aware of Yeager's injuries and serious need for medical assistance and declined to provide assistance despite that awareness.

The relevant chronology is as follows.  First, at 9:06 a.m., Officer Hurst and CO II Mendoza entered the run for a security check.  As noted, Officer Hurst looked into Yeager's cell during that security check and a reasonable jury could conclude that Officer Hurst became aware of Yeager's injuries and need for medical assistance as a result.  Although CO II Mendoza was not with Officer Hurst when this occurred, CO II Mendoza was Officer Hurst's FTO, which creates at least a weak inference that Officer Hurst would have informed CO II Mendoza of what he had just seen.

Second, at 11:00 a.m., CO II Mendoza asked CO II Marshall, who was the assigned control room officer, to complete the formal count (even though CO II Mendoza did not have the authority to make such a request).  At or around 11:20 a.m., CO II Marshall

stopped in front of Yeager's cell, stood in front of the cell and stared into it for approximately three minutes, and at one point made an aborted effort to remove his radio from its holster in preparation to make a radio call. Afterward, CO II Marshall made conflicting statements about his conduct. As explained below, this episode provides sufficient evidence from which a reasonable jury could conclude that CO II Marshall became aware of Yeager's injuries and need for medical assistance. And although CO II Mendoza was not with CO II Marshall when this occurred, all of the unusual details create at least a weak inference that CO II Mendoza arranged for CO II Marshall to perform this particular count because he wished to create deniability as to his awareness of Yeager's injuries and need for medical assistance.

Third, as noted, at 12:52 p.m., Officer Hurst once again looked into Yeager's cell. Once again, CO II Mendoza was not present, but there is at least a weak inference that he became aware of Officer Hurst's observations in light of his role as Officer Hurst's FTO.

Fourth, as noted, at or around 2:42 p.m., Officer Bromund and CO II Mendoza approached Yeager's cell. CO II Mendoza stopped walking right before reaching the cell while Officer Bromund looked into the cell, then spoke to CO II Mendoza and gestured over his shoulder toward the cell. This episode provides further circumstantial evidence that CO II Mendoza was aware of Yeager's injuries and need for medical care, even though CO II Mendoza did not derive that awareness from a direct look into Yeager's cell.

Fifth, as noted, at or around 3:17 p.m., Officer Bromund started conducting a security check but stopped short of Yeager's cell. CO II Mendoza was watching Officer Bromund complete this walk from the control room, and CO II Mendoza and Officer Bromund later gave arguably conflicting accounts of why Officer Bromund stopped short. Although this episode might seem benign in isolation, a reasonable jury could conclude that, at least when it is considered in conjunction with all of the other evidence concerning CO II Mendoza's unusual conduct during the preceding hours, it serves as further proof of CO II Mendoza's awareness of Yeager's injuries and need for medical attention.

Alternatively, CO II Mendoza argues he is entitled to summary judgment under the

second prong of the qualified immunity analysis due to the absence of clearly established law. (Doc. 282 at 14-15.) Like Officers Bromund and Hurst, CO II Mendoza emphasizes that the constitutional right to direct-view safety checks was not clearly established until, at the earliest, the Ninth Circuit's *Gordon* decision in 2021. (*Id.*)

These arguments fail for the same reasons as Officer Bromund's and Officer Hurst's arguments. Plaintiffs' claims against CO II Mendoza are not premised on the mere absence of safety checks and *Lemire* provides the clearly established law showing that CO II Mendoza's challenged conduct was unlawful on February 24, 2020.

e.    **CO II Marshall**

CO II Marshall "does not dispute Yeager had a serious need" but contends he is nevertheless entitled to summary judgment because he "did not know of the assault nor was he aware of any facts that allowed him to infer that Yeager needed medical attention. The only available information was the current state of the cell and the appearance of the inmate. Due to inmates cleaning up the results of the assault, the cell's condition was effectively normal. There was no visible evidence of an assault (i.e., blood, misarranged cell, etc.) on the cell walls, bunk beds, or floors. Further, Yeager's appearance did not visibly indicate a need for medical attention. [CO II] Marshall asserted that Yeager appeared to be asleep." (Doc. 285 at 12-13.)

This argument lacks merit because it ignores the existence of genuinely disputed issues of material fact. As discussed, a reasonable jury could conclude that Yeager's injuries and need for medical care would have been apparent to anyone who looked into his cell between 9:00 a.m. and 4:16 p.m.—and, thus, choose to disbelieve CO II Marshall's claim that he did not notice anything out of the ordinary when he looked into Yeager's cell at 11:20 a.m. The Court also notes that a reasonable jury could view the circumstances surrounding CO II Marshall's visit to Yeager's cell at 11:20 a.m. as suspicious—CO II Marshall stood in front of the cell, stared into it for approximately three minutes, at one point made an aborted effort to remove his radio from its holster in preparation to make a radio call, and then made conflicting statements about his conduct.

CO II Marshall next argues that he is entitled to summary judgment because there is insufficient evidence of causation. (Doc. 285 at 13-14.) This argument fails for the same reason as Officer Bromund's causation argument—it ignores Dr. Sharma's opinion, which creates a genuinely disputed issue of material fact over whether Yeager would have survived if he had received prompt medical attention following CO II Marshall's visit to his cell at 11:20 a.m.

Next, CO II Marshall argues he is entitled to summary judgment under the second prong of the qualified immunity analysis due to the absence of clearly established law. (Doc. 285 at 9-11.) Like Officers Bromund and Hurst and CO II Mendoza, CO II Marshall emphasizes that the constitutional right to direct-view safety checks was not clearly established until, at the earliest, the Ninth Circuit's *Gordon* decision in 2021. (*Id.* at 9-10.) Separately, CO II Marshall acknowledges that "[t]here are other cases where officers were not protected by qualified immunity when they noticed someone was unconscious" but contends those cases are distinguishable because they "involve (a) either pretrial detainees (Fourteenth Amendment standard) or free citizens (Fourth Amendment standard), instead of prisoners (Eighth Amendment standard); and (b) the officers caused the decedent to become unconscious, evidencing the officer's knowledge of the person's unconscious state." (*Id.* at 10-11.)

These arguments fail for the same reasons as Officer Bromund's, Officer Hurst's, and CO II Mendoza's arguments. Plaintiffs' claims against CO II Marshall are not premised on the mere absence of safety checks and *Lemire* provides the clearly established law showing that CO II Marshall's challenged conduct was unlawful on February 24, 2020.

CO II Marshall's final two arguments mirror Officer Bromund's final two arguments—namely, (1) Plaintiffs' familial association claims fail because they are contingent on a finding that Yeager's Eighth Amendment rights were violated; and (2) there is insufficient evidence to support an award of punitive damages. (Doc. 285 at 14-15.) Those arguments fail for the same reasons as Officer Bromund's.

…

II.    <u>Count Two</u>

In Count Two of the complaint, Plaintiffs assert a state-law wrongful death claim against the State.  (Doc. 1-3 ¶¶ 66-74.)

The State argues it is entitled to summary judgment on Count Two because, under A.R.S. § 12-820.02(A)(4), it enjoys immunity from liability for "[a]ny injury caused by a prisoner to any other prisoner" unless (1) the individual Defendants acted intentionally or with gross negligence; and (2) the individual Defendants' actions were the proximate cause of Yeager's death.  (Doc. 260 at 8-17.)  As for the gross negligence standard, the State contends it is "closely intertwined" with "the deliberate indifference element of proof under Section 1983" and argues that Plaintiffs cannot establish gross negligence here because "there is no evidence that any of the Officer Defendants had knowledge of any risk or threat to Mr. Yeager" and "[n]one of the Officer Defendants knew that Mr. Yeager had been assaulted . . . until the ICS was initiated at 16:17."  (*Id.* at 11, 14.)

These arguments are unavailing.  As discussed in Part I.C above, a reasonable jury could conclude that at least four of the Individual Defendants became aware, long before 4:17 p.m., of Yeager's injuries and need for medical assistance and then acted with deliberate indifference to Yeager's serious medical needs, thereby proximately causing Yeager's death.  As the State acknowledges, the gross negligence standard resembles the deliberate indifference standard, so Plaintiffs' evidence is also sufficient to create a jury question on the issue of gross negligence.

The State's final argument is that it is entitled to summary judgment on any claim for punitive damages associated with Count Two because, under A.R.S. § 12-820.04, it has absolute immunity from punitive damages associated with state-law claims.  (Doc. 260 at 17.)

Plaintiffs do not respond to this argument.  (Doc. 306.)  The Court construes this omission as a concession and the State is correct in any event—under A.R.S. § 12-820.04, "a public entity . . . is [not] liable for punitive or exemplary damages."  *Id.*

…

**IT IS ORDERED:**

    1.    The reference to the Magistrate Judge is **withdrawn** as to all six pending summary judgment motions (Docs. 249, 258, 252/282, 260, 269, 285.)

    2.    Officer Bromund's motion for summary judgment (Doc. 249) is **denied**.

    3.    CO II Mendoza's motion for summary judgment (Docs. 252 and 282) is **denied**.

    4.    Officer Hurst's motion for summary judgment (Doc. 258) is **denied**.

    5.    Officer Elvey's motion for summary judgment (Doc. 269) is **granted**.

    6.    CO II Marshall's motion for summary judgment (Doc. 285) is **denied**.

    7.    The State's motion for summary judgment (Doc. 260) is **granted in part and denied in part**.  More specifically, the motion is granted as to Plaintiffs' claim against the State in Count One and as to Plaintiffs' request for punitive damages associated with Count Two.

    8.    This action is referred by random lot to Magistrate Judge Morrissey for the purpose of conducting a settlement conference.

    9.    The parties must jointly contact the chambers of Magistrate Judge Morrissey at 602-322-7680 within 14 days of the date of this Order to schedule a settlement conference.

    Dated this 31st day of March, 2025.

Dominic W. Lanza
United States District Judge